# EXHIBIT 1

**SUPPLEMENTAL DECLARATION OF ANDRE KURZ, ATTORNEY-AT-LAW, IN SUPPORT OF APPLICATION FOR DISCOVERY PURSUANT TO 28 U.S.C. § 1782**

André Kurz, attorney-at-law, declares the following under penalty of perjury pursuant to 28 U.S.C. § 1746:

1. I am an attorney admitted to practice law in Switzerland since April 30, 2013. I held various positions as in-house legal counsel and have been an independent attorney-at-law since 2021. I am based in Zurich, Switzerland and practice law at Kurz Legal.

2. I am counsel to Union des Associations Européennes de Football ("UEFA") in connection with a contemplated Swiss criminal proceeding (the "Contemplated Criminal Proceeding"), more fully described in my August 26, 2026 Declaration filed in support of UEFA's Application for Discovery Pursuant to 28 U.S.C. § 1782. As previously explained, I have significant experience in Swiss criminal law and criminal procedure, including domestic and cross-border commercial disputes and criminal proceedings. I believe that I am appropriately qualified to express an informed view on the matters covered by this declaration.

3. Since submitting my original Declaration, I have reviewed: (1) the Response in Opposition to UEFA's 28 U.S.C. § 1782 Application filed by FIFA (Americas), Inc. and FWC2026 US, Inc.'s (collectively, "FIFA U.S."), (2) the Declaration of Alain Macaluso ("Macaluso Decl."), and (3) the Compendium of Sources Cited in the Declaration of Alain Macaluso. I make this Supplemental Declaration to respond to certain arguments made by FIFA U.S.'s Swiss law expert Alain Macaluso. The opinions expressed in this Supplemental Declaration are my own and are based on my personal knowledge, experience, and education, and on my review of the factual record provided to me by UEFA and counsel in the United States, including the Exhibits attached to applications for discovery submitted under 28 U.S.C. § 1782 (the "Section 1782 Applications").

4. Below, I describe (I) UEFA's authority to initiate the Swiss criminal proceeding; (II)

the role of private claimants in Swiss proceedings and evidence gathering; (III) the financial loss element under Article 158 of the Swiss Criminal Code; (IV) the managerial position element under Article 158 of the Swiss Criminal Code; and (V) the availability of potential other means of assistance such as the Mutual Legal Assistance Treaty.

## I. UEFA'S AUTHORITY TO INITIATE THE SWISS CRIMINAL PROCEEDING

5. Macaluso wrongly asserts that, under Swiss law, prosecutors have "complete discretion" to decide whether to open a criminal investigation, investigate persons or facts within the scope of that investigation, or bring charges. Macaluso Decl. ¶¶ 11, 16, 24, 30. To the contrary, Swiss prosecutors have an obligation to initiate proceedings when they become aware of possible criminal offences prosecuted ex officio (including offences under art. 158 SCC) and their discretion to decline to prosecute is strictly cabined. Macaluso also incorrectly states that a private party like UEFA has "no rights" in this process. *Id.* ¶¶ 11, 22, 30. In fact, private complainants have legal authority to bring complaints, triggering the obligation to investigate, and to submit additional information to the prosecutor, as detailed below.

6. Swiss law provides a mechanism for private parties, such as UEFA, to set criminal proceedings regarding offences prosecuted ex officio in motion. Under Article 301 of the Swiss Criminal Procedure Code, any person is entitled to report a suspected offence to the prosecuting authorities by filing a criminal complaint in writing or orally. In addition to UEFA itself, UEFA's members, who have endorsed this proceeding, each have independent standing as complainants with respect to a claim under Article 158 of the Swiss Criminal Code. Moreover, as members of FIFA, UEFA's members may have additional claims under Swiss law.[1]

---

[1] *See Swiss FA 'Cannot Justify' Its Support for Infantino's Re-Election as Fifa President*, The Guardian (Sept. 30, 2026), https://www.theguardian.com/football/2026/sep/30/gianni-infantino-fifa-swiss-football-association-withdrawn-support-president-election-bid (Exhibit A).

7. The complainant must present the reported facts and the resulting suspicion with as much detail and documentation as possible so that prosecuting authorities do not regard the initial suspicion ("*Anfangsverdacht*") as insufficiently substantiated and close the file ("*Nichtanhandnahme*" or "*Einstellung*") before any in-depth review takes place. Such closure without investigation (a "non-entry" or "*Nichtanhandnahmeverfügung*") is available only where (a) the elements of the offence or the procedural prerequisites are *manifestly* not met ("*eindeutig nicht erfüllt*"), (b) a procedural bar exists (limitation, double jeopardy, immunity, missing authorization), or (c) prosecution is waivable under Article 8 of the Swiss Criminal Procedure Code, as described in paragraph 9, below. *See* Article 310(1), Swiss Criminal Procedure Code. Where factual or legal clarification requires investigative measures, non-entry is impermissible and the prosecutor must open under Article 309 of the Swiss Criminal Procedure Code.

8. When a private party files a complaint pursuant to Article 301, the prosecuting authorities are required to examine the complaint and, where the statutory threshold is met, open an investigation. Article 7 of the Swiss Criminal Procedure Code codifies this obligation to prosecute *ex officio* offenses ("*Verfolgungszwang*"): "The criminal justice authorities are obliged to commence and conduct proceedings that fall within their jurisdiction where they are aware of or have grounds for suspecting that an offence has been committed."

9. Similarly, Article 309(1)(a) of the Swiss Criminal Procedure Code requires the prosecutor to open an investigation at the sufficient suspicion ("*hinreichender Tatverdacht*") threshold, i.e. a concrete and plausible factual basis from which the possibility of an offence can be inferred. Where the factual or legal position needs clarification through investigative measures, opening is mandatory ("*in dubio pro duriore*"). The prosecutor's practical ability to prioritize investigations based on available resources does not reduce this obligation or equate to legal

discretion to decide whether or not to initiate proceedings. While this inquiry is fact-sensitive, based on my review of the facts including the statements of Mr. Infantino and other current or recently former FIFA officials, UEFA's contemplated complaint provides sufficient suspicion to trigger the obligation to investigate under Article 309(1)(a).

10. Pursuant to Article 8 of the Swiss Criminal Procedure Code, the prosecutor may only decline to initiate proceedings in specific, narrowly defined circumstances:

a. "[I]f the level of culpability and consequences of the offence are negligible." Article 52, Swiss Criminal Code.

b. "If the offender has made reparation" and "admitted the offense," lesser penalties are "suitable," and the interest in prosecution and harm are "negligible." Article 53, Swiss Criminal Code.

c. "If the offender is so seriously affected by the immediate consequences of his act that a penalty would be inappropriate." Article 54, Swiss Criminal Code.

d. If "[t]he offence is of negligible importance in comparison with the other offences with which the accused is charged as regards the expected sentence or measure." Article 8(2)(a), Swiss Criminal Procedure Code.

e. If "any additional penalty imposed in combination with the sentence in the final judgment would be negligible." Article 8(2)(b), Swiss Criminal Procedure Code.

f. If "an equivalent sentence imposed abroad would have to be taken into account when imposing a sentence for the offence prosecuted." Article 8(2)(c), Swiss Criminal Procedure Code.

g. "[I]f the offence is already being prosecuted by a foreign authority or the prosecution has been assigned to such an authority." Article 8(3), Swiss Criminal

Procedure Code.

I am not aware of any facts suggesting that any of these exceptions would apply in the context of UEFA's contemplated criminal complaint.

11. Swiss prosecutors also have no unrestricted discretion to decline to investigate persons or facts that the complaint identifies as within the scope of the suspected offense. Under the "*Untersuchungsgrundsatz*," the prosecutor must clarify all facts relevant to the offence, incriminating and exculpatory alike, and must use all suitable and legally permissible means of proof. *See* Articles 6 and 139, Swiss Code of Criminal Procedure. Selection, timing and sequencing of individual measures remain within the prosecutor's tactical discretion, but that discretion does not extend to non-investigation of persons or facts that fall within the sufficient-suspicion perimeter. If additional relevant conduct or participants are identified during the investigation, Article 7 of the Swiss Code of Criminal Procedure obliges the prosecutor to pursue them within the same or a related proceeding.

12. UEFA's intended role is that of a complainant, which is a recognized and procedurally meaningful position under Swiss law. Submitting a criminal complaint is the intended and only procedure for a party like UEFA that becomes aware of suspected criminal conduct to initiate an investigation of that conduct. Indeed, complex Swiss economic-crime cases typically proceed in this manner: complainants (and, where they qualify, aggrieved parties) are a material source of factual and documentary input at both the pre-opening and investigative stages. Complainants in economic-crime investigations are commonly the primary source of factual and documentary input, and the prosecutor must receive and process such material under Article 6 of the Criminal Procedural Code. Complainants also have authority to submit additional information after the initial report under Article 301 of the Swiss Code of Criminal Procedure.

## II. THE ROLE OF PRIVATE CLAIMANTS IN SWISS PROCEEDINGS AND EVIDENCE GATHERING

13. Macaluso characterizes private claimants' rights as narrow, and questions whether a Swiss prosecutor would accept evidence from a private party obtained through foreign discovery. Macaluso Decl. ¶¶ 11–14, 31. However, the rights of private claimants under Swiss law are directly comparable to the rights of private complainants before the European Commission that I understand the United States Supreme Court found sufficient in *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241 (2004), including with respect to evidence gathering. Such evidence is neither inadmissible nor otherwise disfavored under Swiss law.

14. I understand that, in *Intel*, the United States Supreme Court held that a private complainant's role before the European Commission in a competition-law proceeding was sufficient to render that complainant an "interested person" under 28 U.S.C. § 1782, emphasizing that a Commission complainant may trigger an investigation and participate in the resulting proceeding, including by receiving information about its progress and submitting materials in response. *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 254-56 (2004). The complainant mechanism in *Intel* is structurally the same mechanism available to UEFA here. A Commission complainant does not have an automatic right to participate in the Commission's investigation; rather, its participation is triggered at defined procedural stages, principally the right to receive a non-confidential version of any statement of objections and to comment on it, and the right to be informed of the Commission's reasons before a complaint is rejected and to respond in writing within a set time limit. Commission Regulation (EC) No 773/2004 of 7 April 2004, arts. 6-8; Commission Notice on the handling of complaints by the Commission under Articles 81 and 82 of the EC Treaty, 2004 O.J. (C 101) 65, pt. III. The position of a Swiss complainant under Article 301 of the Swiss Criminal Procedure Code is directly analogous. As with a Commission

complainant, a Swiss complainant does not control the investigation, but it has legal authority to trigger the prosecutor's obligation to investigate, to be informed, upon request, of the action taken on its complaint, and to submit additional information and documentation to the prosecutor both at the time of filing and as the matter proceeds. Swiss Code of Criminal Procedure, arts. 301, 309(1)(a); *see* ¶¶ 6-9, 12, above. In both systems, the complainant's core guaranteed right is the same in substance: notice of the authority's intended course of action and a corresponding opportunity to supply further information or argument addressing it, rather than a freestanding right to direct the investigation itself.

15. Swiss prosecutors can and do accept evidence gathered by private claimants, including through foreign discovery. Under Federal Supreme Court caselaw on Articles 139–141 of the Swiss Criminal Procedure Code, private-party evidence obtained *lawfully* is generally admissible. Evidence obtained by UEFA through these proceedings would presumptively be admissible under this rule.

16. No provision of Swiss criminal procedure or Swiss criminal law prohibits or disfavours a complainant or private claimant from gathering evidence abroad through the lawful procedures of a foreign court.

## III. THE FINANCIAL LOSS ELEMENT UNDER ARTICLE 158 OF THE SWISS CRIMINAL CODE

17. Macaluso opines that UEFA could not satisfy the "financial loss" requirement of Article 158 of the Swiss Criminal Code because it did not personally suffer financial loss from the suspected offense. Macaluso Decl. ¶¶ 19, 29. But the complainant need not be the injured party under Article 158.

18. Article 158 provides, in relevant part, that "Any person who by law, an official order, a legal transaction or authorisation granted to them, has been entrusted with the management of

the property of another or the supervision of such management, and in the course of and in breach of their duties causes or permits that other person to sustain financial loss shall be liable to a custodial sentence not exceeding three years or to a monetary penalty [...] If the offender acts with the intention of securing an unlawful gain for themselves or another, a custodial sentence not exceeding five years or to monetary penalty shall be imposed." art. 158 para. 1 SCC ("Criminal Mismanagement").[2]

19. Article 158 protects the pecuniary interests of a principal whose affairs are being managed by an agent. The "other person" who must "sustain financial loss" under the law is the principal, not the complainant. art. 158 para. 1 SCC. The offense therefore does not require that UEFA, as complainant, suffer any financial loss itself.

20. The offense of Criminal Mismanagement is punishable at the attempt stage under Article 22 of the Swiss Criminal Code ("Criminal liability for attempts"). An attempt is complete once the perpetrator has begun to carry out the offence with the requisite intent. Thus, under Article 158, the actual occurrence of financial loss is not required so long as the perpetrator acted with intent to cause such loss. The withdrawal of the FFE proposal therefore cannot defeat criminal liability at the attempt stage.

## IV. <u>THE MANAGERIAL POSITION ELEMENT UNDER ARTICLE 158 OF THE SWISS CRIMINAL CODE</u>

21. Macaluso claims that UEFA cannot satisfy the requirements of Article 158 of the Swiss criminal code because Gianni Infantino did not hold a qualifying managerial position with respect to the FIFA Forward Enterprise ("FFE") proposal because he did not have sole decision-making authority. Macaluso Decl. ¶¶ 18, 64. Yet there are significant indicators that Infantino

---

[2] The Swiss federal government publishes an English language translation of the Swiss Criminal Code at https://www.fedlex.admin.ch/eli/cc/54/757_781_799/en.

exercised *de facto* autonomy and authority, which is all that Article 158 requires.

22. Article 158 liability does not turn on the suspected perpetrator's title. The core question is whether the perpetrator is under a duty of care towards the assets ("*Vermögensfürsorgepflicht*" or "*Garantenstellung*") and, in performing that function, disposed of not insignificant assets with a sufficient degree of autonomy. This definition extends to factual managers ("*faktische Geschäftsführer*") and to persons who, without formal signature power or external representation, in fact exercise independent responsibility for another's assets.

23. The central criterion is autonomy ("*Selbständigkeit*"). Under the settled case-law and doctrine, autonomy is lacking where the person is subject to continuous control and supervision, is so restricted by instructions that only a very limited scope of action remains, or merely participates in a subordinate capacity or as an adviser (BSK-Niggli, Art. 158 N 18). Similarly, purely preparatory advice, clerical work or the mere gathering of decision-making bases and preparation of recommendations is generally insufficient (BSK-Niggli, Art. 158 N 42).

24. While FIFA's member associations and the FIFA Council retained certain approval powers, there is a sufficient factual basis to conclude that Infantino nonetheless exercised sufficient autonomous authority to qualify as a manager.

25. The existence of a putative approval requirement cannot defeat managerial authority where there is no actual control or supervision by the approving body. The manner in which Infantino sought to obtain the FIFA bodies' approval is relevant in this regard: the member associations were asked to approve the FFE proposal without adequate documentation, under significant time pressure and with a financial incentive. The FIFA Management Board was, on short notice and without prior information, given only a few hours to endorse the proposal. There is a factual basis to conclude that Infantino sought to neutralize effective internal control over the

transaction. Had the transaction been approved on those terms, he would in fact have acted without meaningful supervision and therefore autonomously in the sense of Article 158.

26. Infantino's de facto autonomy is also substantiated by the fact that he was, over several months, able to prepare, negotiate and shape the FFE transaction on his own initiative, to engage external advisers on FIFA's behalf, and to enter into arrangements with investors and advisors, in particular Thrive Capital and J.P. Morgan.

## V. THE AVAILABILITY OF POTENTIAL OTHER MEANS OF ASSISTANCE SUCH AS THE MUTUAL LEGAL ASSISTANCE TREATY

27. Macaluso asserts that § 1782 discovery is unnecessary because Swiss prosecutors can obtain necessary U.S.-based evidence through foreign assistance treaties such as the United States-Switzerland Mutual Legal Assistance Treaty ("MLAT"), 27 U.S.T. 2019. Macaluso Decl. ¶¶ 17, 33–37. But MLAT is not available to private parties, and cannot be utilized even by prosecutors until an investigation is initiated. Tools like § 1782 therefore provide a separate, complementary method of obtaining discovery during the complaint-phase.

28. The coercive powers of Swiss prosecutors are limited to Swiss territory. Swiss prosecutors have no independent authority to compel production of discovery from U.S. entities without U.S. judicial or executive assistance, including mutual legal assistance.

29. The United States-Switzerland MLAT facilitates cooperation between U.S. and Swiss authorities in the investigation and prosecution of criminal matters. Private parties like UEFA are not eligible to seek assistance under MLAT.

30. Section 1782 discovery complements rather than displaces MLAT as a discovery tool. As detailed above, under Swiss law, a complainant under Article 301 must set forth the facts and documentation of a suspected offense as fully as possible to permit prosecuting authorities to determine whether the statutory threshold has been met and an investigation must be opened. Thus,

in offenses involving U.S.-based entities or events, Section 1782 discovery is indispensable in developing a fulsome factual record to support the opening of the criminal investigation. Only once an investigation has been opened does the MLAT instrument become available to the Swiss prosecutor.

31. Information and documents central to the suspected criminal liability in this matter are within the exclusive control of U.S. parties, including FIFA (AMERICAS), Inc.; FWC2026 US, Inc.; Joshua Kushner; Thrive Capital Management, LLC; Gregory Maffei; and BANN Ventures, Inc. Obtaining such evidence is essential to the preparation of a fully substantiated complaint that would permit Swiss authorities to conduct a meaningful criminal-law assessment and open a criminal investigation. That investigation, and the initiating complaint, are prerequisites to MLAT assistance, not alternatives.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed: October 5, 2026
Switzerland

By: ______________________
André Kurz
Kurz Legal

*Counsel for Applicant Union des Associations Européennes de Football (UEFA)*

# EXHIBIT A

Gianni Infantino

# Swiss FA 'cannot justify' its support for Infantino's re-election as Fifa president

- **SFV withdraws support after endorsing candidacy in June**
- **Swiss-born Infantino has faced calls for his resignation**




Gianni Infantino was born in Brig, an Alpine town in southern Switzerland. Photograph: Denis Balibouse/Reuters

*Reuters*

Wed 30 Sep 2026 13.19 EDT

Prefer the Guardian on Google

The Swiss Football Association (SFV) has withdrawn its support for Gianni Infantino's bid for another term as Fifa president, the organisation confirmed on Wednesday.

The executive committee reversed its support for Infantino, who was born in Brig, an Alpine town in Valais canton in southern Switzerland, in a meeting this week after endorsing his candidacy in June.

"The decision follows a comprehensive reassessment of developments over the past few months," the SFV said in a statement. "From the SFV's perspective, various incidents raise fundamental questions regarding leadership, governance, transparency and decision-making processes within Fifa."

Infantino is seeking re-election in March but has faced growing opposition since his plans to sell a stake in Fifa tournaments, including the World Cup, were revealed in July. The subsequent outcry led to them swiftly being abandoned.

The withdrawal is the latest blow to Infantino, with football associations in England, Wales, France, Serbia and other European countries having already pulled their endorsements before the election. Uefa has pledged to present a rival candidate before the November deadline.

Infantino, who has been Fifa president since 2016, has faced calls for his resignation amid widespread pleas for reform in the governing body. The 56-year-old wrote this month in a letter to member associations that he was open to talks over reform, but the SFV said key questions regarding Fifa's responsibilities and decision-making process had been left unanswered.

"As these have not been convincingly clarified, we cannot justify continuing to support Gianni Infantino's candidacy," the SFV said.